**MARYLAND PEOPLE'S COUNSEL, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Public Service Commission of the State of New York, Washington Gas Light Company, Pennsylvania Gas and Water Company, Baltimore Gas and Electric Company, UGI Corporation, Columbia Gas Transmission Corporation, et al., Process Gas Consumers Group, Public Service Commission of West Virginia, City of Charlottesville, Virginia, Intervenors.**

**No. 84–1019.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1985.

Decided May 10, 1985.

---

Carmen D. Legato, Washington, D.C., with whom John K. Keane, Jr. and Thomas C. Gorak, Baltimore, Md., were on brief, for petitioner.

Joanne Leveque, Atty. F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Solicitor, F.E.R.C., were on brief, for respondent. Jerome M. Feit, Solicitor, F.E.R.C., Washington, D.C., entered an appearance for respondent.

Stephen J. Small, Charleston, W.Va., with whom Giles D.H. Snyder, Charleston, W.Va., was on brief, for intervenors Columbia Gas Transmission Corp., et al.

Frank P. Saponaro, Jr. and Jennifer K. Walter, Washington, D.C., were on brief, for intervenor UGI Corp.

Frederick Moring, Jennifer N. Waters, Washington, D.C., Hodges B. Childs and Charles A. Herndon, Jr., Baltimore, Md., were on brief, for intervenor Baltimore Gas and Elec. Co.

Edward J. Grenier, Jr., William H. Penniman and Richard A. Oliver, Washington, D.C., entered appearances for intervenor Process Gas Consumers Group.

Glenn W. Letham and Channing D. Strother, Jr., Washington, D.C., entered appearances for intervenor Pennsylvania Gas and Water Co.

Richard E. Hitt entered an appearance for intervenor Public Service Com'n of West Virginia.

Stanley W. Balis, Washington, D.C., entered an appearance for intervenor City of Charlottesville, Va.

Richard A. Solomon and David D'Alessandro, Washington, D.C., entered appearances for intervenor Public Service Com'n of the State of N.Y.

Lewis Carroll, Washington, D.C., entered an appearance for intervenor Washington Gas Light Co.

Before MIKVA, GINSBURG and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This is a challenge to the Federal Energy Regulatory Commission's approval of what it described as an "experimental increase in [natural gas] pipeline competition." That increase was to be achieved by agreement of a pipeline and its producers to amend the high-priced gas purchase contracts entered into between them in earlier years, so as to permit the producers to sell the committed gas elsewhere (at current market prices), crediting the volume of such sales against the pipeline's high-priced purchase obligations. This challenge is brought, curiously enough, not by the competing pipelines or producers to whose flanks this new spur of competition is being applied, but by representatives of the putative beneficiaries, customers of the pipeline system. Their complaint is that, under the arrangements approved by the Commission, the only customers eligible to purchase the cheaper released gas are industrial users who would, at the higher gas prices agreed to in the original contracts, switch to an alternate fuel. They claim that because of this limitation "captive customers" of the pipeline—those who do not have alternate fuel sources to which they may turn—receive no net benefit, but to the contrary suffer a net loss from the arrangement. The principal issue before us is whether the Commission set forth a reasonable basis for believing that the program it approved will benefit all pipeline ratepayers.

## I

A modest understanding of the complex regulatory background of this dispute is necessary to evaluate the arguments made before us.[1] Pipelines regulated by the Natural Gas Act transport natural gas from producers to distributors and end-users in other states. Ordinarily (though not invariably) they purchase the gas on their own account and resell it to their customers. While they may transport gas purchased directly by distributors or end-users from producers, they have no common-carrier obligation to do so. Their rates to distributors (but not to end-users) are regulated by FERC. However, while that portion of the rate attributable to transportation costs (the fixed and incremental costs of constructing and operating the pipeline) is determined by standard public utility ratemaking techniques, the much larger portion attributable to the cost of the transported gas is effectively unregulated at the pipeline stage. FERC permits that cost to be passed through, without assuring that the purchase price was a prudent one. A pipeline's purchase costs for all the gas it acquires are averaged to determine the appropriate gas-cost component of its rates.

Previously, lack of gas price regulation at the pipeline stage would have made little difference, since FERC (or more accurately its predecessor, the Federal Power Commission) regulated gas prices (for interstate gas) at the wellhead, controlling the maximum prices that producers could charge. Because it fixed those prices well below market, a large discrepancy developed between the price for interstate gas and the price for unregulated intrastate gas, and gas production was withheld from the interstate market. After the interstate gas shortages and curtailments of 1976–77, Congress almost entirely terminated Commission wellhead-price regulation, and provided in the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3432 (1982) ("NGPA"), statutorily prescribed wellhead price ceilings for various categories of gas, in both inter-state *and* intra-state markets.

---

1. For the principles set forth in this portion of the opinion, *see generally* N. CLARK & G. CLARK, GOVERNMENTS, MARKETS AND GAS (Energy, Economics & Environment Institute 1984); Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry*, 97 HARV.L.REV. 345 (1983).

Certain categories of gas (notably, so-called "deep gas" from wells below 15,000 feet) were immediately deregulated; so-called "old interstate gas" (generally, gas dedicated to interstate commerce from wells producing in commercial quantities before April 20, 1977) was left forever regulated, subject to a price ceiling close to the old regulated price with an adjustment only for inflation;[2] and so-called "new gas" (generally, gas from wells first producing in commercial quantities after April 20, 1977) was made subject to constantly increasing price ceilings that would eventually reach a figure predicted to approximate the market price in 1985, at which point new gas also would be deregulated.

The problem ultimately giving rise to the present litigation is that the 1978 predictions of the 1985 market were much in error. Factors ranging from the increased wellhead prices and impending total decontrol, to greater energy conservation, to the lower prices of competing fuels, have turned the natural gas shortages of the 1970's into a natural gas surplus. Thus, as early as the summer of 1983—a year and a half before the scheduled deregulation of new gas—the formulary statutory maximum price for new gas had already reached or exceeded the market-clearing price in many geographic markets. *See* N. CLARK & G. CLARK, *supra*, at 16 (*citing* Remarks of C.M. Butler, III, Chairman, FERC, before the American Enterprise Institute Conference on Implications for Natural Gas in a More Competitive Market (Washington, D.C., June 14, 1983)). Pipelines, however, by reason of their practice of entering into long-term contracts with producers, were already locked into purchases, for years to come, of NGPA unregulated gas and new gas in volumes and at prices based upon the 1978 expectations.

If all natural gas customers were as a practical matter compelled to buy gas, the consequence of this miscalculation would merely be that they would be paying more

for the gas they purchase than it is now "worth." In fact, however, many existing customers (and many would-be customers whose new business was contemplated in the pipelines' long-term purchases) can shift to alternate fuels that are cheaper than the gas that has been purchased by the pipelines (though not cheaper than the current market price of gas). The departure of these customers imposes two added burdens upon the customers that remain: (1) the "fixed cost" component of their rates will rise, because it must now be divided among a smaller number of rate-payers, and (2) the gas cost component of their rates will rise even further above its already-inflated level, since the pipelines' average gas cost per unit volume will be substantially increased by "take-or-pay" liabilities to producers—that is, liabilities under standard provisions of their long-term contracts requiring payment for a minimum volume of purchase *whether or not it is in fact taken.* Of course these additional increases make it worthwhile for even more customers to leave the system, so that the situation becomes still worse.

## II

To meet this situation, which has been described as placing the natural gas industry in "chaos" and "turmoil," N. CLARK & G. CLARK, *supra*, at 16 & 17, one pipeline, Columbia Gas Transmission Corporation ("Columbia"), invoked the *force majeure* provisions of its gas purchase contracts with all of its suppliers to reduce its purchase liability of gas below "take-or-pay" and minimum daily purchase levels for the period commencing April 1983 through at least November 1983. Recognizing that this unilateral action would prompt litigation about whether *force majeure* principles properly applied, Columbia sought to conclude negotiated contract modification agreements with its suppliers. On June 3, 1983, it concluded such an agreement with its largest supplier, Exxon Corporation. The core of the agreement was that Colum-

---

**2.** The Commission was given continuing authority to increase, but not decrease, the ceiling prices for this category of gas. 15 U.S.C. § 3314(b)(2). That authority will of course become progressively insignificant as the supplies of old interstate gas are depleted.

bia would release its contract rights to certain categories of gas in specified Exxon fields (subject to retraction if Columbia should need the gas to fulfill its customer obligations), and would transport that released gas to direct purchasers from Exxon on Columbia's system; in exchange for which Exxon would credit Columbia's take-or-pay liability with the volume of released gas sold, on Columbia's system or elsewhere. Sales by Exxon to customers off Columbia's system would be subject to a right of first refusal by Columbia's customers.

To implement this so-called special marketing program ("SMP"), on August 1, 1983 Columbia filed an application for a temporary certificate of public convenience and necessity to transport the released gas, pursuant to section 7(c) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(c).[3] The application contained a limitation (not expressed in the Columbia-Exxon agreement but evidently contemplated) upon the categories of customers to whom the transported released gas would be sold—and it is that limitation which ultimately is the focus of this litigation. The requested certificate would have authorized transportation of released gas sold only to a certain class of customers—namely, industrial end-users who would use the gas to displace alternate fuels, to prevent a plant closing or to reopen a closed plant. Numerous parties intervened in the proceedings, including Maryland People's Counsel ("MPC"), an agency of the State of Maryland authorized to represent the interests of the consumers

of the state in proceedings before federal regulatory agencies.[4] MPC argued that the program would increase gas costs to customers who were not eligible to participate in the SMP, particularly residential users, and would result in discrimination in the sale and transportation of natural gas in violation of sections 4 and 7 of the NGA, 15 U.S.C. §§ 717c, 717f. MPC requested an opportunity to develop issues of fact relating to the determination of whether the proposed certificates would serve the public convenience and necessity.

The Commission arranged an informal conference with interested parties, which was held on September 1, 1983. On November 10, 1983, it issued its Findings and Order, 25 F.E.R.C. (CCH) ¶ 61,220 (1983) [hereinafter cited as Initial Columbia SMP Order], rejecting the request for an evidentiary hearing on the ground that there were no disputed issues of material fact, and granting Columbia's requested certificate of convenience and necessity. In several respects, however, the Commission modified the requested certificate: It required Columbia to permit all its suppliers, not merely Exxon, to participate in the SMP; it expanded somewhat the category of eligible released gas purchasers (although generally still limiting it to those with alternative sources of fuel); and it required that the gas transported under the program be a higher priced mix (i.e., a mix of gas from different fields, which had been purchased by Columbia at higher prices) than the gas identified in the release agreement with Exxon.[5] That same day,

---

3. The application was filed jointly with Columbia Gulf Transmission Company, an affiliated company which transports gas for Columbia.

4. See Md.Ann.Code art. 78, § 15 (1980). We have found MPC to have standing to bring a related appeal in *Maryland People's Counsel v. FERC,* 760 F.2d 318 (D.C.Cir.1985).

5. Columbia originally intended to release a mix of gas whose purchase price by Columbia was apparently below the average price of Columbia's total supply. This would have left Columbia's regular customers with more expensive gas. The Commission therefore flatly excluded certain cheaper categories of gas from the SMP. *See* Order Clarifying Prior Orders and Denying

Rehearing, 26 F.E.R.C. (CCH) ¶ 61,031 at p. 61,-090 (1984) (Ordering Paragraph U). Also, the Commission required that the cost of gas released equal or exceed the average cost for the Columbia system. *See* Initial Columbia SMP Order, *supra,* 25 F.E.R.C. (CCH) at p. 61,564 (Ordering Paragraph C); *see also* Order Clarifying Prior Orders and Denying Rehearing, *supra,* 26 F.E.R.C. (CCH) at p. 61,090 (amendment to Ordering Paragraph C). Of course the fact that the released gas had been sold *to Columbia* at the average price Columbia had paid in no way means that it would be sold to new purchasers at that price. To the contrary, it is common ground—and the whole purpose of the pro-

the Commission authorized other pipelines to initiate SMPs similar to Columbia's. *See Transcontinental Gas Pipe Line Corp.,* Docket Nos. RP83–11–000 & RP83–30–000, Order Amending Rate Settlement, etc., 25 F.E.R.C. (CCH) ¶ 61,219 (1983); *Tenneco Oil Co.,* Docket No. CI83–269–000, Findings and Order After Statutory Hearing, etc., 25 F.E.R.C. (CCH) ¶ 61,234 (1983).

On December 20, 1983, the Commission issued an Order Clarifying Prior Order and Granting Rehearing for the Purpose of Further Consideration, 25 F.E.R.C. (CCH) ¶ 61,401 (1983), which granted rehearing for the purpose of further consideration of the issues presented in rehearing applications filed by several parties, including MPC. On January 16, 1984, the Commission issued its Order Clarifying Prior Orders and Denying Rehearing, 26 F.E.R.C. (CCH) ¶ 61,031 (1984) [hereinafter cited as Final Columbia SMP Order]. This again rejected MPC's arguments that an evidentiary hearing was required and that restrictions on participation in the SMP should be lifted so as to include customers without alternative sources of fuel. Shortly thereafter, MPC filed a timely petition for review in this Court under 15 U.S.C. § 717r.

### III

■ The initial question we confront is whether there any longer exists a live controversy of the sort essential to support our jurisdiction, *see Radiofone, Inc. v. FCC,* 759 F.2d 936 (D.C.Cir.1985). The orders that MPC challenges expired by their terms on October 31, 1984. *See* Initial Columbia SMP Order, *supra,* 25 F.E.R.C. (CCH) at p. 61,564 (Ordering Paragraph A). Ordinarily, this would render the case moot. There is an exception to the general rule of mootness, however, for controversies "capable of repetition yet evading review." *Weinstein v. Bradford,* 423 U.S. 147, 148, 96 S.Ct. 347, 348, 46 L.Ed.2d 350

(1975). To fit within this exception, the controversy must be such that:

(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and

(2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.

*Id.* at 149, 96 S.Ct. at 348. Both factors are present here: The orders MPC challenges remained in force for slightly less than one year, not enough time to allow their validity to be fully litigated. With respect to the second factor, the Supreme Court has required not merely a "physical or theoretical possibility" of recurrence, *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982), but a "demonstrated probability," *Weinstein v. Bradford,* 423 U.S. at 149, 96 S.Ct. at 348. That requirement is also satisfied here, since the Commission has continued the SMP, with many of the same features that MPC challenges, for another year. *See Maryland People's Counsel v. FERC,* at 318–319 (D.C.Cir.1985) (noting relation between FERC orders at issue in this case and successor orders).[6] In similar situations, this court has reviewed challenges to agency action. *See, e.g., Consumer Federation of America v. FPC,* 515 F.2d 347, 351 (D.C.Cir.), *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975). We conclude that MPC's substantive challenge to the Commission's orders is not moot.

MPC's procedural challenge—based on the Commission's failure to conduct a formal evidentiary hearing—is arguably not "capable of repetition yet evading review," since the Commission appears to have made some effort to hold hearings after its approval of Columbia's SMP. Because our ruling on the substantive challenge is enough to dispose of the case, we do not reach this issue.

---

gram—that the new sales would be at prices significantly below Columbia's average cost.

**6.** The Commission did not extend a feature of its orders affecting local distribution companies (Ordering Paragraph T, 25 F.E.R.C. (CCH) at p. 61,566) challenged by intervenors Baltimore

Gas and Electric Company and UGI Corporation. These challenges are therefore moot, and since UGI's intervention on behalf of petitioner rests exclusively on this ground it is hereby dismissed.

## IV

Our review of the merits of this matter is of course governed by the principle that the Commission's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). (Although 15 U.S.C. § 717r(b) specifies that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive," as we explained in *Association of Data Processing Service Organizations v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 681–86 (D.C.Cir.1984), this is no more than a recitation of the application of the "arbitrary and capricious" standard to factual findings.) Moreover, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Our role is to determine " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Id.*, 103 S.Ct. at 2867 (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)).

■ The issue presented for our review is a narrow one. We have not been asked to pass on the Commission's general authority to approve SMPs such as Columbia's, but only on its power to permit exclusion, from the category of authorized purchasers of released gas under such an SMP, of the pipeline's captive customers or (as the Commission calls them) "core market"—*i.e.*, those customers who have no readily available alternative source of fuel. Paragraph J of the Commission's order, as finally amended, provided as follows:

(J) Any gas released and sold under this program to distributors or endusers which are served, directly or indirectly, by any pipeline (provided that no tariff provision prevents such sale), shall be limited to new loads not previously served by natural gas or to requirements which are being or would otherwise be served by:

(1) alternative fuels;

(2) producer direct sales arrangements;

(3) gas made available under industrial sales programs, or other similar programs;

(4) gas sold by pipelines under special discount rates, or in off-system sales;

(5) propane or synthetic natural gas; or

(6) interruptible sales service schedules.

Initial Columbia SMP Order, *supra*, 25 F.E.R.C. (CCH) at p. 61,565; Final Columbia SMP Order, *supra*, 26 F.E.R.C. (CCH) at p. 61,091 (Amendment to Ordering Paragraph J). The effect of this limitation of eligible participants is that captive customers of the Columbia system are excluded from purchasing the cheaper released gas.

No one questions that it would have been within the Commission's power to strike restrictions on eligible purchasers from Columbia's proposal. *See Tennessee Gas Pipeline Co. v. FERC*, 689 F.2d 212, 214–15 (D.C.Cir.1982); *Transcontinental Gas Pipe Line Corp. v. FERC*, 589 F.2d 186, 190 (5th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). The Commission offered several justifications for declining to do so, which we consider in turn.

### A. *The "Cost Spreading" Rationale*

The Commission recognized that Paragraph J raised substantial competitive concerns:

Where, as here, a party raises "nonfrivolous allegations" that our actions will have "significant anticompetitive effects," their "inherent substantive importance and complexity" demand careful scrutiny.... Indeed, these issues gave us pause even before they were raised by

[MPC] since our order, on its face, places limits on competition.

Final Columbia SMP Order, *supra,* 26 F.E.R.C. (CCH) at p. 61,085 (citation omitted). Nonetheless, the Commission justified the program as essential to avoid saddling captive customers with an increased share of the fixed costs of gas pipelines as fuel-switchable customers left the system because of high prices. The Commission reasoned that if the SMP increased volumes of gas transported through the pipeline, the fixed costs could be spread over greater volumes, thereby lowering the costs assigned to each share. Thus, even though the SMP was limited to certain eligible customers, ineligible customers would benefit directly from the reduction in the portion of fixed costs they would be forced to bear. *See* Final Columbia SMP Order, *supra,* 26 F.E.R.C. (CCH) at pp. 61,087–88.

MPC, however, raised several arguments not responded to by the Commission. Most important, the Commission's fixed cost saving rationale does not explain why such savings would not similarly accrue to the benefit of captive customers in the absence of the Paragraph J limitation on eligible purchasers. Additional SMP sales would presumably still occur, and fixed costs would still be spread to the benefit of captive customers. On this appeal, counsel for the Commission seems to concede that the orders' fixed cost rationale supports only the SMP generally, not the Paragraph J restrictions in particular. Respondent's brief places the fixed cost explanation under the heading "Reasons Behind the SMP Program," followed by a separate section discussing "Reasons for Ordering Paragraph (J)." *Compare* Brief Part II for FERC at 10 *with id.* at 15.

Inadequate for the same reason as its fixed cost spreading rationale is the Commission's brief allusion to "the avoidance of costs associated with take-or-pay exposure" as justifying Paragraph J. *See* Final Columbia SMP Order, *supra,* 26 F.E.R.C. (CCH) at p. 61,086. Apparently the point is that to the extent Columbia sells gas under its SMP, ineligible customers will receive a benefit from the crediting of such sales against Columbia's take-or-pay liabilities, reducing the fuel-cost component of their bills. While there may be reason to doubt whether such credits could constitute a significant benefit to captive customers, *see* Reply Brief for MPC at 33–35, or indeed whether take-or-pay liabilities even *exist* (Columbia, at least, is on record as asserting that they can be avoided by reason of *force majeure*), we need not reach that issue. Avoidance of take-or-pay liabilities, like spreading of fixed costs, would presumably take place under an SMP with or without the Paragraph J limitation. While it may constitute a justification for the SMP in general, it cannot provide support for the limitation.

The only way to make sense of the Commission's cost spreading rationale is to posit that the Commission believed that elimination of the Paragraph J limitation would have caused either Columbia or Exxon to abandon the SMP entirely. Since the Commission did not set forth this proposition in its opinions, we cannot in any event sustain its action on that basis. *See SEC v. Chenery Corp.,* 318 U.S. 80, 94–95, 63 S.Ct. 454, 462–463, 87 L.Ed. 626 (1943). Nonetheless, because such an assumption seems to have been implicit in the Commission's decision we discuss its consequences briefly.

Even if the choice was between gas moving under Columbia's SMP with the Paragraph J restriction and no gas moving under Columbia's SMP, the Commission still did not establish sufficient cost spreading justifications for its approval of the limitation. MPC argued that any savings to captive customers produced by Paragraph J would be much more than offset by the monopoly pricing it will foster. Most, if not all, major gas pipelines, including Columbia, are "backward vertically integrated"—that is, they own significant gas exploration, development and production affiliates. *See* Schwartz, *Pricing and Competition in the Regulated Energy Industries,* in NEW DIMENSIONS IN PUBLIC UTILITY PRICING 555 (1976); Remarks of Ronald G. Carr, Deputy Assistant Attor-

ney General, before the American Gas Association (Mar. 31, 1982), *reprinted in Public Utility Holding Company Act Amendments: Hearings on S. 1869, S. 1870 and S. 1871 Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs*, 97th Cong., 2d Sess. 350–54 (1982); Pierce, *supra*, 97 Harv.L.Rev. at 367. This backward integration provides significant incentives for pipelines to pay above-market prices for the gas they purchase, producing increased profits to their production affiliates. As noted earlier, the Commission's ratemaking practices do not subject a pipeline's gas costs to a "prudence standard," but guarantee their recovery from ratepayers except in circumstances involving misrepresentation of price paid or abuse rising to the level of "reckless disregard." *See, e.g., Columbia Gas Transmission Corp.*, 26 F.E.R.C. (CCH) ¶ 61,034 (1984), *petition for review pending sub nom. Associated Gas Distributors v. FERC*, No. 84–1100 (D.C. Cir. filed Mar. 16, 1984). In *Tennessee Gas Pipeline Co.*, 21 F.E.R.C. (CCH) ¶ 61,004 (1982), the Commission explained why, nevertheless, the risk of exorbitant gas purchase costs need not concern consumers:

> The intervenors' primary concern is that as a result of Tennessee's gas purchasing practices, Tennessee's sale price charged to its distributor customers is so high as to cause large industrial users to switch to alternative fuels. If a pipeline experiences extensive load loss due to fuel switching, then the same fixed costs of the pipeline must be shared among a smaller number of remaining customers, resulting in potentially higher rates. Hence, both interstate pipelines and their distributor customers should have a vital interest in assuring that the price of gas to end-users remains at marketable levels.

21 F.E.R.C. (CCH) at p. 61,009.[7] In other words, imprudent gas purchasing practices would be checked by the pipelines' fear that what is gained by increased prices will be lost by reduced sales, as fuel switchable customers leave their systems. MPC argued to the Commission that the restrictive SMP destroys this check by enabling the pipelines to "price discriminate"—that is, to sell their over-priced gas to captive customers while still retaining fuel-switchable customers by serving them at market rates. Accordingly, MPC argued that while "[t]he primary aim of [the NGA] was to protect consumers against exploitation," *FPC v. Hope Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944), the SMP as currently structured facilitates exploitation.

MPC contended that any captive customer savings from cost spreading attributable to a restricted SMP are dwarfed by the savings from competitive pricing forgone as a consequence of Paragraph J. The Commission rejected this contention primarily on the ground that there was "clear, quantifiable record evidence of [fixed cost] benefits" to ineligible customers, while there had been no "attempt to quantify" gas cost savings. *Final Columbia SMP Order, supra*, 26 F.E.R.C. (CCH) at p. 61,088. Even unquantified factors, however, cannot be dismissed without further inquiry where their impact is both evident and massively significant. That is certainly the case here, given the fact that both marginal and fixed transportation costs (the latter of which will be more broadly dispersed by the SMP) account for only about 15 percent of wholesale gas rates, while gas costs (which would be reduced by competition significantly enough, evidently, to entice fuel switchable customers back into the system) account for about 85 percent. The Department of Energy has concluded that the reduction of fixed cost charges "is insignificant when compared to savings that could

---

7. In *Columbia Gas Transmission Corp., supra*, the Commission rejected a procedural holding in its *Tennessee* decision, concluding that gas purchasing issues should be considered only in purchase gas adjustment (PGA) proceedings rather than in general rate proceedings. *See* 26 F.E.R.C. (CCH) at p. 61,132. It reiterated, however, that it would provide pass-through of gas costs without a prudence review. *Id.* at p. 61,-100.

have been realized if all constraints on SMP's had been eliminated." U.S. DEP'T OF ENERGY, INCREASING COMPETITION IN THE NATURAL GAS MARKET: SECOND REPORT REQUIRED BY SECTION 123 OF THE NATURAL GAS POLICY ACT OF 1978, at 85 (1985).[8] It is clear to us that further consideration of this factor was needed if the Commission was to exercise its powers, as the Supreme Court has required, so "as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." *Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959). Competition may well be an effective way to achieve that, but the Commission has not explained why competition restricted in the fashion it has approved would do so merely because of its effect upon costs shared by those to whom the competition itself is denied.

### B. *Enhancement of Pipeline Competition*

On this appeal, the rationale the Commission advances most strenuously in defense of Paragraph J is that competition between pipelines for one another's "core" or captive market would not necessarily be in the public interest. The Commission's order expressed this point as follows:

[W]e are not yet prepared to say that competition for the firm markets would achieve a net benefit. The pipelines have made long-term supply commitments, have designed their operations, and have major investments in pipeline capacity and other facilities, *e.g.,* above ground and underground storage and synthetic gas, in order to serve these markets. Under competition, there would be winners and losers and the pipelines that lost firm markets would be forced to attempt to recover their costs from other captive markets that were unable to take advantage of competition. The shifting

of these costs could constitute undue discrimination. On the other hand, failure to recover these costs could place the pipeline in financial jeopardy which could affect the reliability of service to those customers and consumers dependent upon the pipeline.

Final Columbia SMP Order, *supra,* 26 F.E.R.C. (CCH) at p. 61,087.

This "winners and losers" rationale plainly cannot support the Paragraph J limitation. In the first place, in order to avoid competition between pipelines for "core" markets it was not necessary to exclude those markets entirely from the SMP. The same result could have been achieved by permitting each pipeline to transport only to its *own* captive customers the gas that is released from its system supply. Reply Brief for MPC at 30. In other words, even if the Commission was justified in preventing pipeline-to-pipeline competition, it offered no justification for limiting producer-to-producer competition within a particular pipeline's service area. Moreover, even if competition between pipelines were allowed, it is quite possible that the downward pressure exerted by competition on gas prices (constituting 85 percent of the captive customers' rates) would outweigh any increased fixed cost burden—enabling even the "loser" pipelines to stay in business by charging their remaining customers higher fixed costs but overall lower rates. The Commission did not even consider this possibility.

In a related argument, the Commission states in its brief that "there is nothing in this program that stops Exxon, or some other producer, from reducing the price it charges Columbia for this gas which it has already contracted to sell to Columbia. No new Section 7 authority is required for that. Were this to happen, Columbia would have a lower cost of purchased gas, which would benefit all of its customers."

---

**8.** This report was released after the Commission's action here. We cite it, however, not for any new facts or novel analysis it contains, nor to criticize the Commission for disregarding it, but rather, as we might cite any recently published scholarly analysis, to support the point that MPC's objection, "quantified" or not, was obviously a serious one which needed refutation.

Brief Part II for FERC at 11. While all that is true, it is ridiculous to assume that Exxon or any other business will lower prices simply because there is nothing that stops it from doing so. The point is that the program approved by the Commission does not permit the stimulus of competition, which alone would cause Exxon to engage in such self-sacrificing behavior.

### C. The "Other Dockets" Rationale

The Commission also reasoned that MPC's concerns would be fully raised and considered in other dockets and in subsequent proceedings regarding Columbia's SMP. *See* Initial Columbia SMP Order, *supra,* 25 F.E.R.C. (CCH) at p. 61,563; Final Columbia SMP Order, *supra,* 26 F.E.R.C. (CCH) at pp. 61,086 & 61,087. As a purely factual matter, the Commission's prediction has been long in being fulfilled: At the time of oral argument in this case, one year after release of the order under challenge, counsel for the Commission was unable to point to any other docket in which the Commission had rendered an opinion addressing MPC's concerns. Predictive reliability aside, however, we do not believe the Commission's Fabian approach to these fundamental issues can be accepted. While there may well be circumstances where a particular objection is more properly deferred to a later proceeding, *cf. State of Louisiana v. FPC,* 533 F.2d 1239, 1244 (D.C.Cir.1976), that is assuredly not the case where the objection goes to the heart of the public interest determination immediately to be made.

The Commission's only specific reason for remitting MPC to later forums—other than what boils down to temporizing ("We have not spoken our last word on this subject," Final Columbia SMP Order, *supra,* 26 F.E.R.C. (CCH) at p. 61,087)—was its belief that Columbia's gas purchasing practices were more properly considered in a pending § 5 proceeding. Initial Columbia

SMP Order, *supra,* 25 F.E.R.C. (CCH) at p. 61,563. But as our earlier discussion indicates, Columbia's gas purchasing practices are not the core of MPC's concern. Even if they are irreproachable, they will produce higher prices for Columbia's captive customers if producer competition has been needlessly stifled. Moreover, a § 5 proceeding is not an adequate substitute for due consideration of an application for a § 7 certificate. *See Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 392, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959). As the Supreme Court has explained:

> [Sections 7(c) and (e)] were added to the Act in 1942, four years after its original passage. Prior to their adoption the only rate-making regulatory tools the Commission possessed were §§ 4 and 5, and they came into operation only after the natural gas was already moving in interstate commerce. Sections 7(c) and (e) were designed to control the certification of gas destined for interstate movement. The purpose of the amendments was to give "the Commission an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure ... *at a time when such vital matters can readily be modified as the public interest may demand...."* House Committee on Interstate and Foreign Commerce, H.R.Rep. No. 1290, 77th Cong., 1st Sess. 2–3 [(1941)].

*FPC v. Hunt,* 376 U.S. 515, 525, 84 S.Ct. 861, 867, 11 L.Ed.2d 878 (1964) (emphasis added) (footnote omitted).[9]

### D. The "Experiment" Rationale

The Commission's last argument is its most disarming:

> [W]e do not mean to suggest that the competition issues raised by [MPC] can simply be discounted. On the contrary,

---

**9.** Of course, sometimes the delay inherent in a § 7 determination might not be in the public interest. Accordingly, in § 7(c), 15 U.S.C. 717f(c), Congress provided that in "cases of emergency" the Commission may issue temporary certificates "to assure maintenance of adequate service." The Commission does not contend that the present case involves an emergency authorization.

it is not really responsive to these claims to suggest that they are merely outweighed by other factors. The fact here is that it is neither appropriate nor possible at this time to assess the full impact of the program implemented by our November 10 order. An experiment is by its very nature unpredictable.... Concededly, this experimental increase in pipeline competition does not go so far as to embrace "core markets." Nonetheless, the step we have taken is a significant departure from the existing regulatory environment. Whether we take additional steps, *e.g.*, to embrace core markets in our experiment, is a matter left for future determination. For now, our experiment must be carefully circumscribed so as not to offend seriously the underlying regulatory strictures.

Final Columbia SMP Order, *supra*, 26 F.E. R.C. (CCH) at p. 61,086 (citation & footnote omitted). As we have recognized in a different regulatory context, there are situations in which "a month of experience will be worth a year of hearings," *American Airlines, Inc. v. CAB*, 359 F.2d 624, 633 (D.C.Cir.), *cert. denied*, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). But just as there are reasonable programs and arbitrary programs, so also there are reasonable experiments and arbitrary experiments. The law governing our review does not demand an impossible predictability, but it does demand an articulation, in response to serious objections, of the Commission's reasons for believing that more good than harm will come of its action—even experimental action. As our discussion above suggests, that has not been provided.

As for the one-step-at-a-time argument: That is an apt response to the objection that, while what the Commission has done is good enough as far as it goes, it should have gone further. MPC's point, however, is that the Commission has taken one step into a chasm instead of leaping across it. MPC asserted that the modest "departure" the Commission proposed would be entirely counterproductive, since it would harm rather than help precisely those customers—the ones vulnerable to pipeline monopoly power—which it was the purpose of the Natural Gas Act to protect. It is no response to say that for the moment the experiment is "carefully circumscribed" to help those who do not need the Commission's protection while hurting those who do.

\*　　\*　　\*　　\*　　\*　　\*

It would be an exaggeration to say that this petition for review has required us to evaluate whether the Commission had, if not the better side, at least a reasonable side, of the argument with MPC over the effects of these orders. On a number of obviously significant points that MPC raised, there is simply no argument to evaluate: the Commission proceeded on its course with no comment, or with comment that was patently unresponsive. As far as we can tell from the record before us, the Commission's decision was not "based on a consideration of the relevant factors," *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867, and was therefore invalid.

Since the orders at issue in this case have already expired, in lieu of mandate we will issue a certified copy of this opinion. As noted earlier, successor orders have already been challenged in other proceedings before this court. By accompanying orders, we are directing the Commission and intervenors on behalf of the Commission in those cases, *Maryland People's Counsel v. FERC*, 760 F.2d 318, and *Laclede Gas Co. v. FERC*, 760 F.2d 318, to show cause why the successor orders should not be vacated and remanded for reconsideration in light of this opinion.

*Petition granted.*